## JONES v. HILL.

No. 31245. Feb. 29, 1944.

*146 P. 2d 294.*

Sigler & Jackson, of Ardmore, for plaintiff in error.

Champion & Fischl, of Ardmore, for defendant in error.

PER CURIAM. This action was instituted by Roger Hill, hereinafter referred to as plaintiff, against Arthur Jones, hereinafter referred to as defendant, to recover damages for the publication of an alleged slander.

The slander was alleged to consist of the following words:

"Mr. Hill, who is now serving as appointee on our school board, is coming up for election. During his term he has made himself very strongly felt; but in a destructive rather than a constructive way. At the time he went in office, we had a good school. It stood right at the top in the county. Now it is far below par. Throughout the county and in nearby adjacent counties our mess is noticeable.

"Among the pupils there is a lack of interest and enthusiasm. There is no aggressive school spirit. There is not a happy high school pupil. The seniors are merely marking time until they may get their diplomas. Many children have quit school and many more wish that they might. If you doubt any of these statements, just investigate.

"How come Mr. Hill on the board, anyway? Was it in an open, honorable way or was it a 'Pearl Harbor Sneak'? Sorry to say it was the latter. On a night that Mr. Smith was to deliver diplomas

to graduates he left the meeting under the 'pretense' of a telegram. In Ardmore he met Mr. Hill and other cohorts; they contacted the county superintendent, and the appointment was consummated. They didn't even consult the other board member. Just did their work under cover of darkness. A man little and crooked in one thing will be little and crooked in another.

"Mr Hill was 'sneaked' in once before, but when the people spoke he was voted 'OUT.' Even though he had at his disposal plenty of money and several highpowered cars.

"The fact is we are in the throes of dictatorship of a one man school board, and Mr. Hill is the 'Rubber Stamp.' Perhaps the reason Mr. Smith is taking so much interest is that he is afraid some man will get in who has a mind of his own. This election isn't Mr. Smith's say, it is the people's. And the people can do their own choosing, they don't need Mr. Smith to choose for them.

"Mr. Hill plays 'Petty-Politics.' He has exercised that principle toward employees, labor and purchases for the school. He has let it be known to employees and others that he intends to continue the same policy if elected. This is still a free country. Neither do we have a right to become offended at, or do harm to another who votes differently than we do. Then how about the teachers he was instrumental in discharging. And to think that neither was given a reason.

"Last year our school experienced a large building program. The superintendent worked hard day and night for its success, and not once did he complain. With great amounts of building material on the grounds and with many men working, and with hundreds of children to watch, there was not an accident and not a note of dissatisfaction. The school continued to achieve its high standard and for this the superintendent should have been retained; not only through merit but also courtesy. But Mr. Hill said 'No.'

"He too, said Mr. Sturdevant wasn't good enough for Dickson, yet one of our largest city high schools was ready to receive him. It seems that qualifications,

teaching ability and sterling character mean nothing to Mr. Hill.

"He was instrumental in 'firing' one of the best and most popular English teachers Dickson has ever had. Yet he told that he was 100% for her. And he told her face to face that he was for her. Then voted against her. Is there such a thing as two-faced prevaricators?

"When the principal's name came up for vote Mr. Hill said 'no.' Then when asked for a reason he said 'I just don't like the man.' That's natural. This teacher is a Christian gentleman; naturally Mr. Hill wouldn't like him. This teacher is a church and Sunday school worker; naturally Mr. Hill wouldn't like him. This teacher doesn't visit 'Honky-Tonks,' drink beer, swear or play poker; naturally Mr. Hill wouldn't like him. Such clean living examples are what we need before our children.

"When Mr. Hill went in office Dickson had a fine 4-H Club. Where is it now? What he did was vote to 'fire' a splendid teacher who is trained and enthusiastic in 4-H work. Dickson winners stood at the top in the County. So he discharged a good teacher and banned 4-H work at Dickson at the same strike.

"There is a business-like and fair way to discharge employees. The way Mr. Hill did was very, very unfair and unjust. These teachers were held in suspense until it seemed too late for them to get another job. He was not satisfied at 'firing' them, he wanted to crush them. Just an instance of 'man's inhumanity to man.' Wonder how he felt when these teachers not only got jobs but got better jobs?

"Mr. Pete Edwards and Mr. Buster Cox are as honorable, as capable, as reliable and as well liked as any two bus drivers in the whole United States, yet Mr. Hill voted them out. In this act he showed disregard for sterling qualities, showed the lack of common sense and displayed his 'petty-politic' attitude. Mr. Hill has spoken, now we the people have come to our time to speak, and put the stamp of approval or disapproval on this 'Petty-Politic' act.

"Then we must not forget the Senior Day episode last year, when our seniors were to spend the day in Durant, but

instead were taken to nearly every roadhouse and honky-tonk from Dickson to Denison, Texas. Mr. Hill put his stamp of approval on this.

"Parents do not want their children to go to such places, they do not take their children to such places and they sure do not want others to take them to such places. Some of these parents made a sacrifice that their children get an insight and inspiration into higher education, not into the ways of the world.

"These children were pledged not to tell, which was admission of guilt. Respect, reverence and confiding in mother and father were cast aside. They were being 'induced' to live their lives apart from their parents. For three weeks these children lived an untruth. They told untruths to protect themselves. They told untruths to protect others. Their consciences hurt them. (Those whose consciences were not already seared.) They spent many sleepless hours at night. They went about doleful. They seemed to have lost interest in life. It was a step toward losing respect for others and worse, that of losing respect for self. When like a stroke out of a clear sky a man from Ardmore, acting on a clue from a man from Denison, broke the news.

"Regarding this affair Mr. Hill would have it appear that he is broadminded and that these mothers are 'Old Fashioned' even 'Old Foggies.'

"Now Mr. Broad Mind, the Devil is the author of broad mindedness and he has a broad road for just such broad minded people to travel. But also, the end thereof is destruction.

"If you wish further evidence against Mr. Hill pay a visit to the Nebo community where Mr. Hill once lived and talk with some of the old-timers. Those who have spoken seem shocked to hear that we have such a man on our board. During the term of Mr. Hill our school has gone from good to bad; in electing him we could only expect it to go from bad to worse.

"To vote is a privilege and this privilege implies an obligation, a duty. In any and all elections we should assert ourselves. So in the coming school election, every voter should respond. To have convictions and not vote them is equivalent to a negative vote. Lack of interest is equally as bad. So ponder this election well and vote, and see that your neighbor votes."

Defendant admits that he had spoken the above words of and concerning the plaintiff, but pleads the truth in justification. Trial was had to a jury. Plaintiff neither pleaded nor offered any proof of any special damage, but based his right to recover upon the predicate that the words which had been spoken of and concerning him were slanderous per se. Demurrer to the evidence of plaintiff and motion for directed verdict interposed by defendant were overruled. The court without objection instructed the jury that if it should find for the plaintiff it might do so in any amount not to exceed the sum of $15,000 as prayed in the petition of plaintiff. The court omitted to instruct the jury with respect to whether the words involved constituted slander per se. Neither party saved any exception to the instructions. The jury returned a verdict in favor of plaintiff and assessed his recovery at the sum of $1. On motion of plaintiff the court rendered judgment in his favor for the sum of $100, and defendant appeals.

As grounds for reversal defendant urges two propositions, which are, in substance, that the judgment is without the support of any competent evidence, and that the judgment is erroneous in that it is not responsive to the verdict.

The plaintiff did not attempt to prove any special damage and his right to recover depends upon whether or not the language upon which the action was predicated amounts to slander per se. 12 O. S. 1941 § 1442 defines slander as follows:

"Slander is a false and unprivileged publication, other than libel, which:

"1. Charges any person with crime, or with having been indicted, convicted or punished for crime.

"2. Imputes in him the present existence of an infectious, contagious or loathsome disease.

"3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualifications in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade or business that has a natural tendency to lesson its profit.

"4. Imputes to him impotence or want of chastity; or,

"5. Which, by natural consequences, causes actual damages."

In Smith v. Gillis, 51 Okla. 134, 151 P. 869, we stated:

"In an action for slander, the words upon which the same is predicated are taken in their most natural and obvious sense; that is, in the plain and popular sense in which they would ordinarily be used and understood."

As heretofore stated, the plaintiff did not plead or attempt to prove any special damage, but relied wholly for recovery upon the language which defendant had admittedly spoken of and concerning the plaintiff. The words so spoken of and concerning the plaintiff, taken in their usual and obvious sense, would not come within the inhibitious of any of the provisions of 12 O. S. 1941 § 1442, and therefore were not slanderous per se. The fact that the words so used were abusive and calculated to annoy and irk the plaintiff was not sufficient to support a recovery in his favor. Franklin v. World Publishing Co., 183 Okla. 507, 83 P. 2d 401; Tulsa Tribune v. Kight, 174 Okla. 359, 50 P. 2d 350; Fite v. Oklahoma Publishing Co., 146 Okla. 150, 293 P. 1073; Phoenix Printing Co. v. Robertson, 80 Okla. 191, 195 P. 487.

When defendant interposed a demurrer to the evidence of plaintiff the trial court should have sustained it for the failure of such evidence to establish slander per se, and therefore to render the words actionable; in the absence of evidence sufficient to support a verdict in favor of plaintiff a cause should not be permitted to go to the jury.

In view of the conclusion which we have reached, it will not be necessary to discuss the contention of the defendant relative to error of the court in rendition of judgment for the statutory minimum to which plaintiff would have been entitled had the evidence been sufficient to go to the jury and the jury had returned a verdict in his favor upon proper instructions.

On account of error hereinabove mentioned, the cause is reversed and remanded.

CORN, C. J., GIBSON, V. C. J., and RILEY, OSBORN, BAYLESS, HURST, and DAVISON, JJ., concur. WELCH and ARNOLD, JJ., dissent.